**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**FIRST CLASS COACH AND**
**EQUIPMENT, INC. ,**

                              **Plaintiff,**

**-vs-**                                                    **Case No.  6:05-cv-969-Orl-31JGG**

**THOMAS BUILT BUSES, INC. &**
**DAIMLERCHRYSLER A.G.,**

                              **Defendants.**
_____

# ORDER

The Plaintiff, First Class Coach And Equipment, Inc., ("FCCE") sued Thomas Built Buses,

Inc. ("TBB") and DaimlerChrysler AG ("DaimlerChrysler") alleging that the Defendants

committed violations of the Florida Motor Vehicle Licensing Act, F.S. § 320.01, *et seq.* (the

"FMVLA"), and seeking remedies under that Act as well as under various common law causes of

action.  This matter is presently before the Court on TBB's Motion to Dismiss (Doc. 19), and

FCCE's Memorandum in opposition thereto (Doc. 26).[1]

**I.     Background**

        A. Parties

        FCCE is a Florida corporation with its principal place of business in Winter Garden,

Florida.  FCCE is a franchised motor vehicle dealer in Florida that has, since 1990, been selling

school and commercial buses manufactured by TBB.

_____

        [1] FCCE's Complaint appears at Doc. 1.

TBB is a North Carolina corporation, and is a wholly-owned subsidiary of Freightliner, LLC ("Freightliner"),[2] which is based in Portland, Oregon, and, in turn, is a subsidiary of DaimlerChrysler, which is a multi-national entity based in Stuttgart, Germany.

B. Facts

*1) The early relationship*

In the late 1980's, TBB had a market share for school bus sales in Florida of less than ten percent, and thus TBB sought to enlarge its market share. During that time, Scott Fewell ("Fewell"), FCCE's original principal, began discussions with TBB about becoming a dealer of TBB products. During those discussions, TBB's representatives informed Fewell that TBB's goal was to achieve a greater market share in Florida. Because of his knowledge of the manner in which TBB paid dealers,[3] Fewell asked whether he would have the opportunity to sell parts and services for the buses TBB sold. Fewell was informed by one of TBB's representatives that as long as he (Fewell) was successful in increasing TBB's market share in Florida, he would: (1) be able to reap benefits from the parts and services market in Florida; and (2) would not have his

---

[2] In 1998, Freightliner purchased TBB. Freightliner owns several other entities that manufacture motor vehicles.

[3] At that time, TBB only paid its dealers $50 when the dealer sold a standard school bus, $500 for a lift-equipped school bus, and $1,500 for transit buses. These amounts, particularly those related to school bus sales, would not allow a dealership to survive on school bus sales alone. Instead, a dealer for TBB often realized most of its profits from the subsequent sale of parts and services for those buses sold within the dealer's territory. Because school buses generally have an effective operating life of twelve to fifteen years, a dealership's main source of income would come from providing parts and services during the operating life of the bus, particularly toward the later part of the bus' operating life. Indeed, sales related to school buses historically constituted the bulk of FCCE's product and parts sales.

market decreased.   Fewell, relying on these representations, then executed a TBB Distributor Sales Agreement on October 11, 1990 (the "1990 Agreement").

The 1990 Agreement originally provided that FCCE's area of responsibility included all counties in Florida south of, and including, Volusia, Marion and Citrus counties.  This territory was subsequently expanded by a 1991 addendum to include all counties in Florida, thereby making FCCE the sole distributor of buses for TBB in Florida.[4]  Thus, despite the thin margins realized on school bus sales, FCCE was not only successful, but made a profit as the sole distributor and source for TBB bus parts, and FCCE was able to increase its revenues and profits each year. FCCE and TBB operated in this manner until 1999.

*2) Developments in 1999*

Several things happened in 1999 that changed the relationship between FCCE and TBB. First, TBB informed FCCE via a letter dated April 13, 1999, that, in the future, FCCE would be responsible for order generation for all school bus sales in Florida.  In exchange for this increase in responsibility, FCCE received an increase in its commission on the sale of TBB products.  Second, later in 1999, TBB announced that it was naming Freightliner of South Florida as a new TBB bus dealer in south Florida.[5]

_____

[4] The first addendum to the 1990 Agreement also required FCCE to assist TBB in the preparation and submission of bids to the State of Florida for the Annual Florida State School Bus Bid.

[5] At that time, Freightliner of South Florida was part of Freightliner's Dealer Development Program, and provided Freightliner with the opportunity to own and operate a dealership in order to generate profits.  Freightliner of South Florida currently does business as Commercial Vehicles of South Florida, Inc.

Third, TBB told FCCE that the parties would have to execute a replacement motor vehicle agreement.  This August 13, 1999 TBB Dealer Sales and Service Agreement (the "1999 Agreement") made several changes to the 1990 Agreement.  The first change prevented FCCE from selling school bus products to private schools, head starts, and other private users of school buses in a number of counties in southern Florida.[6]  The second change prevented FCCE from selling commercial bus products in those same counties.[7]  Freightliner of South Florida replaced FCCE as the distributor of school bus products to private schools, and as distributor of commercial bus products, in those counties.  Third, TBB began to require a "commission split" between FCCE and Freightliner of South Florida.   FCCE had previously established a market for TBB products throughout Florida, and thus continued to sell TBB products in Freightliner of South Florida's territory.  The 1999 Agreement required FCCE to share commissions from those sales with Freightliner of South Florida, usually via a 60-40 split, despite the fact that those sales resulted solely from FCCE's work.

*3) The 2003 Agreement*

TBB and FCCE operated under the 1999 Agreement through its original term ending December 31, 2002, and then through an extension ending June 30, 2003.  Around the date of the end of the extension, TBB informed FCCE that it was "required" to sign a new dealership

---

[6] The seventeen counties in which FCCE was excluded from the private school market included: Broward, Charlotte, Collier, Dade, Desoto, Glades, Hardee, Highlands, Hendry, Indian River, Lee, Martin, Monroe, Okeechoobee, Palm Beach, Sarasota, and St. Lucie.  Florida has sixty-seven counties, thus leaving FCCE to operate on its own in fifty counties.  *See* http://www.myflorida.com/.

[7] *See* note 6 *supra*.

-4-

agreement, which was ultimately executed on September 3, 2003 (the "2003 Agreement").[8]   TBB

did not provide FCCE with written notice stating the specific reasons why FCCE was being

replaced in southern Florida, nor did TBB provide written notice and an accompanying affidavit

regarding the cancellation, modification and/or non-renewal of the 1999 Agreement to the Florida

Department of Highway Safety and Motor Vehicles.  The 2003 Agreement provided FCCE with an

area of operations that was reduced to fifty-one counties.[9]   FCCE protested the terms of the 2003

Agreement, and explained to TBB why it was a bad business decision to cut FCCE's area of

operations.  TBB responded that FCCE had "no choice," and that FCCE had to sign the 2003

Agreement.  FCCE signed the 2003 Agreement because it believed that it could either accept that

agreement, or terminate its relationship with TBB.[10]   The 2003 Agreement also contained a

release provision, by which FCCE released any claims it had against TBB that existed at the time

of that Agreement.

---

[8] The nature of this "requirement" allegation is unclear, because if the contract extension were expiring, it seems only natural that the parties would enter a new contract.

[9] Those fifty-one counties include Gadsden, Leon, Wakulla, Franklin, Liberty, Gulf, Calhoun, Jackson, Bay, Washington, Homes, Walton, Okaloosa, Santa Rosa, Escambia, Jefferson, Madison, Taylor, Suwannee, Lafayette, Dixie, Columbia, Gilchrist, Levy, Baker, Union, Alachua, Marion, Putnam, Clay, Nassau, Duval, Saint Johns, Flagler, Volusia, Brevard, Osceola, Orange, Polk, Sumter, Citrus, Hernando, Pasco, Pinellas, Hillsborough, Manatee, Sarasota, Seminole, Bradford, Hamilton and Lake Counties.  Thus, despite FCCE's assertion that its area of operations was "cut in half," it clearly maintained an area of operations covering more than two-thirds of Florida's geographical area. *See* http://www.fl-counties.com/msp/FLMap_beta.htm.

[10] FCCE asserts that it would not willingly choose to end its relationship with TBB because it was "locked in" to working with TBB because of FCCE's significant brand-specific investment made over the previous thirteen years.

The 2003 Agreement impaired FCCE's ability to sell and service TBB products, particularly those related to school buses, by limiting FCCE's area of operations, and thus FCCE's revenues and profits were significantly reduced after the 2003 Agreement.  FCCE asserts that TBB cut FCCE's area of operations despite TBB's past representations that FCCE's market would not be decreased as long as FCCE increased TBB's market share in Florida.  FCCE also asserts that Freightliner of South Florida has failed to achieve the same level of market penetration as FCCE, which has weakened demand for TBB products in southern Florida, and in turn, affected the demand for TBB products throughout the state.[11]

C. Claims and Arguments

FCCE asserts eleven counts,[12] which may be divided into two categories.  First, FCCE asserts four claims for alleged violations of the FMVLA (Counts Two, Three, Four and the second Count Nine).  Second, FCCE asserts six common law claims arising out of the dealings between TBB and FCCE, as follows: breach of contract and implied covenant of good faith (Count One), fraud (Count Five), negligent misrepresentation (Count Six), unjust enrichment (Count Seven), estoppel (Count Eight), and recoupment (Count Nine).

TBB has moved to dismiss all of these claims, arguing that the FMVLA does not apply to buses and thus does not apply in this case, and that the remainder of FCCE's claims are barred by a release contained in the 2003 Agreement.

---

[11] FCCE asserts that Freightliner of South Florida (now Commercial Vehicles of South Florida, Inc.) is now owned by Florida Detroit Diesel-Alison, Inc., a subsidiary of DaimlerChrysler.  Thus, FCCE asserts, TBB's selection of Freightliner of South Florida as its southern Florida distributor gave that territory to an affiliated company.

[12] FCCE only has counts numbered up to nine, but it has two counts each numbered "Count Five," and two counts each numbered "Count Nine."  One of those counts, the first "Count Five," is asserted against DaimlerChrysler, and is therefore not discussed herein.

II.     **Standard of Review**

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County*, 1 F.3d 1558, 1565 (11th Cir. 1993), and must limit its consideration to the pleadings and any exhibits attached thereto.  FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief."  *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)).  This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action.  *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001).  Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Id*. (internal citation and quotation omitted).  "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to

the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

III.    **Legal Analysis**

A. FMVLA Claims

The FMVLA is a statute governing, *inter alia*, the relationship between motor vehicle dealers and manufacturers, which prohibits a manufacturer from taking a wide variety of actions alleged to be harmful to a motor vehicle dealer.  The Act is remedial in nature and was designed to ameliorate the economic imbalance between large national manufacturers and local (smaller) dealers. *See Mike Smith Pontiac, GMC, Inc. v. Mercedez-Benz of N. Am.*, 32 F.3d 528, 533-34 (11th Cir. 1994) (act was promulgated to "ameliorate the abusive tactics and harsh practices automobile manufacturers commonly imposed on their franchisees").  More specifically, sections 320.60 through 320.70 of the FMVLA "were enacted to facilitate the legislative intent of ensuring fair dealing between motor vehicle manufacturers, motor vehicle dealers, and motor vehicle consumers." *Dick Winning Chrysler-Plymouth of Ft. Myers, Inc. v. Chrysler Motors Corp.*, 750 F.2d 895, 898 (11th Cir. 1985); *see also Int'l Harvester Co. v. Calvin*, 353 So. 2d 144, 147 (Fla. 1st DCA 1977); F.S. § 320.605.  For example, section 320.641 "prohibits unfair cancellations of franchise agreements." *Dick Winning*, 750 F.2d at 898; *see also* F.S. § 320.641.  Other sections provide various measures of protection to franchised dealers as well as civil remedies for violations of the FMVLA.  *See*, *e.g.*, F.S. §§ 320.64 ("Denial, suspension, or revocation of license; grounds"), 320.6415 ("Change in plan or system of distribution"), 320.643 ("Transfer, assignment or sale of franchise agreements"), 320.695 ("Injunction"), 320.697 ("Civil damages").

As a remedial statute, its provisions should be interpreted broadly to effectuate its purpose. *Mike Smith*, 32 F.3d at 534; *Citizens Co-op Gin v. U.S.*, 427 F.2d 692, 698 (5th Cir. 1970).[13]  That rule of interpretation, however, begs the question of whether the relationship between TBB and FCCE is governed by the FMVLA in the first place.

The FMVLA defines a covered "motor vehicle dealer" as any person, firm, company, corporation or other entity who

>    1.    Is licensed pursuant to s. 320.27 as a "franchised motor vehicle dealer" and, for commission, money, or other things of value, repairs or services motor vehicles or used motor vehicles pursuant to an agreement as defined in subsection (1), or
>
>    2.    Who sells, exchanges, buys, leases or rents, or offers, or attempts to negotiate a sale or exchange of any interest in, motor vehicles, or
>
>    3.    Who is engaged wholly or in part in the business of selling motor vehicles, whether or not such motor vehicles are owned by such person, firm, company or corporation.

F.S. § 320.60(11)(a).  Thus, a dealer is one who sells "motor vehicles" and a motor vehicle is defined in section 320.60(10) as follows:

>    (10) "Motor vehicle" means any new automobile, motorcycle, or truck, including all trucks, regardless of weight, including "heavy truck" as defined in s. 320.01(10) "truck" as defined in s. 320.01(9), the equitable or legal title to which has never transferred by a manufacturer, distributor, importer or dealer to an ultimate purchaser. . . .

F.S. § 320.60(10).  TBB asserts that buses do not fall within the definition of "motor vehicle" as defined by section 320.60(10), and thus argues that the FMVLA is inapplicable to this case.[14]

---

[13]  All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[14] This question of whether a bus should be classified as an automobile under Florida Statutes sections 320.60 through 320.70 appears to be a question of first impression.

At first blush, it is apparent that while a bus may fall within the general definition of a "motor vehicle,"[15] it is not specifically included in the statutory definition.  Rather, the reach of this particular statute extends to *automobiles*, *motorcycles*, or *trucks*.  Since a bus is clearly not a motorcycle or truck, FCCE must rely on the definition of automobile to be inclusive of a 40-passenger school bus.

The dictionary definition of an automobile is "four wheeled automotive vehicle designed for passenger transportation."  Webster's Collegiate Dictionary, 10th ed. (1996).  The relevant Florida statutes do not define "automobile."  The Florida Uniform Traffic Control Law, Florida Statutes section 316.001, *et seq.*, however, does define both "bus" and "school bus."  A bus is

> [a]ny motor vehicle designed for carrying more than 10 passengers and used for the transportation of persons and any motor vehicle, other than a taxicab, designed and used for the transportation of persons for compensation.

F.S. § 316.003(3).  Further, a "school bus" is

> [a]ny motor vehicle that complies with the color and identification requirements of chapter 234 and is used to transport children to or from public or private school or in connection with school activities . . . .

F.S. § 316.003(45).[16]   In any event, while the definition of an automobile may be less than clear, it is common knowledge that there is a difference between an automobile and a bus, and certain Florida statutes do make the distinction. For example, license fees for automobiles and school buses are treated separately.  *See* F.S. §§ 320.08(2), (5)(c).

---

[15] The generic definition of "motor vehicle" is "an automotive vehicle not operated on rails; esp. one with rubber tires for use on highways."  Webster's Collegiate Dictionary, 10th ed. (1996).

[16] The general definition of "bus" is "a large motor vehicle designed to carry passengers usually along a fixed route according to a schedule."  Webster's Collegiate Dictionary, 10th ed. (1996).

FCCE, however, contends that any four-wheeled motorized vehicle designed to transport passengers is an "automobile," which would include school buses. FCCE's logic is that if a four-passenger sedan is an automobile, then why not a seven-passenger SUV or a 15-passenger van? And, if a 15-passenger van is included, why wouldn't a 40-passenger bus be considered an automobile? FCCE contends that this reasoning is consistent with the somewhat broader definition of "motor vehicle" set forth in Florida Statute section 320.01(1)(a).[17]

Unfortunately for FCCE, the relevant portion of the FMVLA, sections 320.60 through 320.70, adopted a more restrictive definition. *See* F.S. § 320.60 ("Whenever used in ss.320.61-320.70, unless the context otherwise requires, the following words and terms have the following meanings"). This portion of the Act thus does not apply the broad definition of "motor vehicle" found in section 320.01(1)(a), but instead limits the definition of "motor vehicle" to certain new automobiles, motorcycles and trucks. F.S. § 320.60(10). *See Aero Prods. Corp. v. Dept. of Highway Safety & Motor Vehicles*, 675 So. 2d 661, 664 (Fla. 5th DCA 1996).

In *Aero Prods. Corp. v. Dept. of Highway Safety & Motor Vehicles*, 675 So. 2d 661 (5th DCA 1996), the Court affirmed an agency's determination that *ambulances* were not motor vehicles within the meaning of section 320.60(10). In so holding, the Court said:

> [H]ad the legislature intended to include ambulances, *school buses,* fire engines and other such vehicles within the franchised dealer law, it would have done so by not providing a separate, narrower definition of "motor vehicle" within that law.

*Id*. at 664 (emphasis supplied). And, while no reported case has addressed the question of whether a bus is a motor vehicle under section 320.60(10), the same rationale would apply here. Indeed,

---

[17] "An automobile, motorcycle, truck . . . or any other [motorized] vehicle operated on the roads of this state, used to transport persons or property . . . ." F.S. § 320.01(1)(a).

the Florida Department of Highway Safety and Motor Vehicles reached this conclusion in *Ark. Bus Exch. Corp. v. Specialty Vehicles, Inc.*, DOAH Case No. 01-0615 Dept. of Highway Safety and Motor Vehicles, August 21, 2001.[18]

Ultimately, whereas the Florida legislature chose to apply a general definition of "motor vehicle" in most instances, it chose instead to apply a more restrictive definition in the statutory sections at issue in this case.[19]  Where a legislature included particular language in one part of a statute, but omitted it in another, the Court must presume that the legislature did so intentionally and purposely.  *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (court must presume that legislature says what it means in statute, and means what it says); *Brandon Chrysler Plymouth Jeep Eagle, Inc. v. Chrysler Corp.*,

---

[18] "An agency's construction and interpretation of a statute which it is authorized by law to administer is entitled to great weight and will not be overturned unless clearly erroneous."  *Aero Prods.*, 675 So. 2d at 664; *see also Edwards v. Shalala*, 64 F.3d 601, 606 (11th Cir. 1995).

[19] Many other states have similar automobile dealership franchise protection statutes, and often apply a broad definition of "motor vehicle" in those statutes.  *See, e.g.,* Ga. Code Ann., § 10-1-622(10) ("every self-propelled vehicle intended primarily for use and operation on the public highways . . ."); Al. St. s.8-20-3(9) ("Every vehicle intended primarily for use and operation on the public highways which is self-propelled . . ."); A.C.A. § 23-112-103(18) ("any motor-driven vehicle having two (2) or more wheels, including, but not limited to, all-terrain vehicles, automobiles, trucks, motorcycles, motor-driven cycles, motor scooters, and motor homes"); C.R.S.A. § 12-6-102(12) ("every vehicle intended primarily for use and operation on the public highways which is self-propelled"); K.R.S. § 190.038(12); N.M.S.A. 1978, § 57-16-3(A); 47 Okl. Stat. Ann. § 562(1); RI St. § 31-5.1-1(9); S.C. Code 1976, § 56-15-10(a).  Other states specifically define "automobile."  *See* I.C.A. § 321.1(42)(d) (defining "car" or "automobile" as "a motor vehicle designed primarily for carrying nine passengers or less, excluding motorcycles and motorized bicycles").  Further, at least one other state has specifically included persons selling commercial buses and school buses in the definition of "motor vehicle dealer."  *See* A.C.A. § 23-112-103(19)(A)(ii).  Clearly, then, if the Florida legislature intended to include buses within the definition of motor vehicles as that definition is applied in sections 320.60 through 320.70 of the FMVLA, and thereby caused those statutes to apply to dealers of buses, it could easily have done so.

898 F. Supp. 858, 863 (M.D. Fla. 1995).  Further, a statute is to be construed "as excluding from

its operation all things not expressly mentioned, especially where the statute enumerates specific

things on which it operates," and "a court may not supply words where the legislature excludes

things by omission."  *Brandon Chrysler*, 898 F. Supp. at 863.  Here, the legislature specifically

applied sections 320.60 through 320.70 to automobiles, motorcycles and trucks, a list which does

not contain the term "bus," and the Court is not free to add or interpret the term "bus" into that list.

The Court concludes, therefore, that buses are not covered by sections 320.60 through 320.70 of

the FMVLA and therefore FCCE's statutory claims must fail.

  B. Common Law Claims

  FCCE's Complaint also asserts various common law claims.  In essence, FCCE complains

that it is no longer the exclusive dealer for TBB buses in Florida, and thus these claims all arise out

of the contractual relationship between the parties.

  *1) Validity of the release provision in the 2003 Agreement*

  The most recent contract between the parties contains a broad release provision which

would ostensibly bar FCCE's common law claims.  The 2003 Agreement incorporates TBB's

"Dealer Sales and Service Agreement Standard Provisions," which contains a section entitled

"Release of Claims," that provides, in relevant part:

> Upon execution of this Agreement by Dealer and in consideration of Company
> entering into this Agreement, Dealer and its owners, members, officers and
> directors, hereby unconditionally release Company and any of its affiliates,
> shareholders, officers, directors, and employees, from any and all claims, demands,
> and liabilities (including, but not limited to, statutory liabilities) which are known
> or which in the exercise of reasonable care should be known, of any kind
> whatsoever, arising out of or in connection with any prior agreements, business
> transactions, course of dealing, discussions or negotiations between the parties prior
> to the effective date hereof.

(Doc. 19 at 26). Since the 2003 Agreement is not governed by FMVLA, the release itself is not prohibited by statute.[20]

Each of FCCE's common law counts is based on the same allegations, namely that: (1) TBB did not honor its commitment to allow FCCE to remain the supplier of TBB products in Florida as long as FCCE achieved its market share goals; (2) TBB did not honor its commitment to FCCE that FCCE would be able to provide exclusive parts and service to TBB products sold in Florida; and (3) TBB violated FCCE's expectations under the various agreements.  (Doc. 1 at 13, 19-20, 21-22).  Notwithstanding FCCE's allegations to the contrary, each of these allegations can be related back to events that occurred prior to the execution of the 2003 Agreement, in particular, the execution of the 1999 Agreement, which began the restriction and erosion of FCCE's area of operation.  Therefore, by the execution of the 2003 Agreement, which contained the release in question, FCCE's common law claims, each of which arose "out of or in connection with . . . prior agreements, business transactions, course of dealing, discussions, or negotiations between the parties prior to the effective date" of the 2003 Agreement, are barred by the plain terms of the release.

_____

[20] Florida Statutes section 320.64 forbids a manufacturer from requiring "a motor vehicle dealer to prospectively assent to a release, assignment, novation, waiver, or estoppel, which instrument or document operates, or is intended by the applicant or licensee to operate, to relieve any person from any liability or obligation under the provisions of ss. 320.60-320.70."  F.S. § 320.64(22).  It appears from the text of this section that only those releases relieving a person from liability or obligation "liability or obligation under the provisions of ss. 320.60-320.70," and thus, even if the statute applied, FCCE's common law claims would not be protected from release or waiver under this section. Regardless, the Court has determined that the FMVLA does not apply in this case, so the release is not statutorily prohibited.

*2) Unconscionability of the release*

FCCE's only remaining argument is to contend that the release provision in the 2003

Agreement is unconscionable.  Florida courts recognize that the term "unconscionable" as it

relates to contracts generally means "shocking to the conscience," "monstrously harsh," or "to

include an absence of meaningful choice on the part of one of the parties together with contract

terms which are unreasonably favorable to the other party."[21]  *Gainesville Health Care Ctr., Inc. v.*

*Weston*, 857 So. 2d 278, 283-84 (Fla. 1st DCA 2003) (internal citations and quotations omitted).

Under Florida law, "[b]efore a court may hold a contract unconscionable, it must find that it is

*both* procedurally and substantively unconscionable."  *Id.* (emphasis in original); *see also Golden*

*v. Mobil Oil Corp.*, 882 F.2d 490, 493 (11th Cir. 1989).  The test for procedural unconscionability

examines the manner in which the contract was entered, and the court must determine whether the

complaining party had a meaningful choice at the time of the contract.  *Fonte v. AT&T Wireless*

*Servs., Inc.*, 903 So. 2d 1019, 1025 (Fla. 4th DCA 2005); *Gainesville Health*, 857 So. 2d at 284.

--------

[21] Florida courts have also emphasized that the concept of unconscionability is to be applied
cautiously, because

> [t]he concept of unconscionability does not mean . . . that a court will relieve a party
> of his obligations under a contract because he has made a bad bargain containing
> contractual terms which are unreasonable or impose an onerous hardship on him. . .
> . [People] should be permitted to enter into contracts that actually may be unreasonable
> or which may lead to hardship on one side.  *It is only where it turns out that one side*
> *or the other is to be penalized by the enforcement of the terms of a contract so*
> *unconscionable that no decent, fairminded person would view the ensuing result*
> *without being possessed of a profound sense of injustice*, that equity will deny the use
> of its good offices in the enforcement of such unconscionability.

*Gainesville Health*, 857 So. 2d at 284 (internal citation and quotation omitted) (emphasis supplied).

The substantive component focuses on the terms of the agreement itself in order to determine whether those terms are unreasonable and unfair. *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. 1st DCA 1999); *Fonte*, 903 So. 2d at 1025. More specifically, the court must determine whether the terms "are so outrageously unfair as to shock the judicial conscience." *Gainesville Health*, 857 So. 2d at 284-85 (internal quotations omitted).

FCCE only challenges the release provision, not the general terms and conditions of the 2003 Agreement.[22] This provision does not limit or release TBB from liability for new or future claims; rather, it bars claims that FCCE presumably could have brought as early as 1999, when the 1999 Agreement apparently began infringing on the parties' alleged original understanding. FCCE has offered no evidence that it disputed or attempted to negotiate this provision at the time the parties entered into the 2003 Agreement. It is only now, recognizing that this provision could bar its previously existing common law claims, that FCCE challenges this provision. This release was part of the parties' bargain.[23] In order to secure the right to sell TBB's buses (albeit in a reduced territory), FCCE agreed to release TBB from all the claims it now makes. FCCE makes no allegations from which the Court could make a finding of substantive unconscionability, and thus

---

[22] In its memorandum, FCCE claims that the release provision of the 2003 Agreement is unconscionable, whereas the Complaint entirely fails to address that provision, and instead focuses solely on the fact that the 2003 Agreement "adversely affected the rights and obligations of [FCCE] by substantially impairing its ability to sell and service TBB products in what had previously been its [area of responsibility] for TBB school buses." (Doc. 1 at 11). Thus there are no factual allegations which the Court can use to examine FCCE's claim that the release provision is unconscionable.

[23] There is no policy in favor of denying parties the right to limit their liability, and thus such provisions in a contract are to be enforced as written. *Ivy H. Smith Co. v. Moretrench Corp.*, 253 F.2d 688, 690-91 (5th Cir. 1958).

FCCE's unconscionability argument fails, and the Court concludes that this release provision is not unconscionable.[24]

Further, while contending that the contract is unconscionable (and presumably, therefore, unenforceable), FCCE seeks damages for its breach.  In short, FCCE wants it both ways.  It seeks to enforce the contract, but avoid its release provisions.  This it cannot do.  FCCE chose to execute the contract, which contained both rights and obligations.  Indeed, FCCE does not even seek recision of the contract, just relief from the release provision.  But FCCE cannot pick and choose those portions of the contract by which it wishes to abide.  *See Albrecht v. U.S.*, 329 U.S. 599, 603 (1947) (noting that "where a party to . . . a contract stands upon its terms to enforce them for his own advantage, he cannot at the same time successfully disavow those terms so far as he conceives them to be to his disadvantage"); *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 259 (7th Cir. 1988) (party cannot accept benefits of a contract and then avoid contract's requirement of foregoing certain rights); *G.E.E.N. Corp. v. Southeast Toyota Distribs., Inc.*, 1994 WL 695364 at *7 (M.D. Fla. Aug. 31, 1994).  The release clause bars FCCE's common law claims.

IV.    **Conclusion**

Because a bus is not a "motor vehicle" as the definition of that term applies under Florida Statutes sections 320.60 through 320.70, the relevant portions of the FMVLA do not apply in this

---

[24] FCCE's unconscionability arguments focus on the relative bargaining power of the parties. This argument relates to procedural unconscionability.  *See Fonte*, 903 So. 2d at 1025; *Gainesville Health*, 857 So. 2d at 284.  The mere fact that the parties' bargaining position may have been unequal, however, does not render a contract unenforceable, because a finding of unconscionability requires a finding of both substantive and procedural unconscionability, and having concluded that the release provision is not substantively unconscionable, the Court need not address the procedural unconscionability arguments.  *See Golden v. Mobil Oil Corp.*, 882 F.2d 490, 493-94 (11th Cir. 1989) ("We need not decide whether the transaction . . . was procedurally unconscionable because we hold that the limitation of liability clause was not substantively unconscionable.").

case, and thus FCCE's claims under that statute must be dismissed.[25]  Further, because the

FMVLA does not apply, the release provision in the 2003 Agreement is not statutorily barred.

That release is not unconscionable, and thus it operates to bar FCCE's common law claims.

Accordingly, it is

     **ORDERED** that TBB's Motion to Dismiss (Doc. 19) is GRANTED.  FCCE's Complaint

is DISMISSED, with prejudice, and the Clerk is directed to close the file.

     **DONE** and **ORDERED** in Chambers, Orlando, Florida on February 3, 2006.

                                             GREGORY A. PRESNELL
                                   UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[25] Although neither party addressed the first Count Five, which asserts an FMVLA claim against DaimlerChrysler, because the Court has determined that the relevant portions of the FMVLA, which include section 320.645 under which the claim against DaimlerChrysler is stated, do not apply to this case, Count Five could not survive a motion to dismiss.  Therefore Count Five asserted against DaimlerChrysler will be dismissed as well.